UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 19-22621-CIV-MORENO**

MARIO ECHEVARRIA,

        Plaintiff,

vs.

EXPEDIA GROUP, INC., HOTELS.COM
L.P., HOTELS.COM GP, LLC, and ORBITZ,
LLC,

        Defendants.

_____/

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Congress passed the Helms-Burton Act on March 12, 1996, following Cuba's downing of two civilian aircrafts registered in the United States. Title III of the Act creates a private right of action against any persons or entities that traffic in properties, which the Cuban government confiscated from people who are now U.S. nationals. Plaintiff, Mario Echevarria, is a U.S. national who claims he inherited a claim to an island off the coast of Cuba called Cayo Coco. He claims that Defendants, Expedia Group, Inc., Hotels.com, and Orbitz trafficked his property by entering into contracts to sell reservations at three hotels that are currently operating on the land he claims his ancestors owned. Defendants move for summary judgment arguing that Plaintiff cannot establish that he owns a claim to Cayo Coco under Cuban law and that the record evidence fails to establish he inherited his claim. Defendants also move for summary judgment on the Act's trafficking prong claiming the record evidence fails to establish scienter as required by the Act and that Defendants sold reservations after having notice of the claim. Defendant Expedia Group, Inc. also moves for summary judgment claiming that as a parent company, it is not liable for the acts

of its subsidiaries. Finally, Defendants' motion for summary judgment argues the record evidence does not establish damages. Plaintiff also filed a motion for partial summary judgment as to the affirmative defenses, which include the lawful travel defense. Because the Court finds there are issues of foreign law that must be determined pursuant to Federal Rule of Civil Procedure 44.1 and there are genuine issues of material fact, the Court denies the motions for summary judgment.

## I.     Background

Plaintiff Mario Echevarria, a U.S. National since March 15, 1983, brought these consolidated actions against Defendants under the Cuban Liberty and Democratic Solidarity Act, 22 U.S.C. §§ 6021-6091 (known as the "Helms-Burton Act"). Defendant Expedia Group, Inc. is a holding parent company and the co-defendants, Hotels.com LP, Hotels.com GP, and Orbitz, LLC are subsidiaries to non-party Expedia, Inc. (a/k/a Expedia-WA).[1]

### A. Ownership and Inheritance

Plaintiff Mario Echevarria's claims stem from real property that he asserts his family owned -- Cayo Coco, an island off the north shore of Cuba. On Cayo Coco, there are three hotels, which Plaintiff refers to as the Trafficked Hotels. They are the Iberostar Mojito, Iberostar Colonial, and the Pullman Cayo Coco.  Specifically, Plaintiff claims that Defendants trafficked in the hotel properties, located on his family's confiscated property. He seeks to recover damages for the trafficking under the Helms-Burton Act.  The trafficking that Plaintiff asserts is that Defendants profited by offering reservations to customers at these hotels on their travel websites.

---

[1] Plaintiff has two cases pending: 19-22620-CIV-MORENO and 19-22621-CIV-MORENO.  Originally, 19-22621 was filed as a class action. The Court denied the motion for class certification.  Both cases raise Echevarria's individual claims for trafficking on Cayo Coco. 19-22620 is for trafficking by the Defendants by selling reservations at the Pullman Cayo Coco Hotel and 19-22621 is for trafficking by the Defendants by selling reservations at the Iberostar Mojito and the Iberostar Colonial Hotels.

The history of Cayo Coco is relevant to the analysis because Defendants moved for summary judgment on the issue of ownership, i.e. whether Mario Echevarria's ancestors owned Cayo Coco and whether he lawfully inherited a 12.5% interest in the island. To that end, Plaintiff's expert Avelino Gonzalez relies on the available documentary evidence, much of which is compiled in a book that he asserts corroborates Plaintiff's ownership claim. Gonzalez's opinion relies, at least in part, on a booklet containing archival documents about the island and is called *Cayo Coco Una Isla Robada al Mar*[2] (Exh. 12 at 9).[3] The booklet describes how Julian Cuevas acquired Cayo Coco through the probate proceedings of his father-in-law Juan Fco. Angulo on February 24, 1876.[4]  At the time, he acquired the property, Julian Cuevas was married to Isabel Angulo y Guzman.  The booklet reads that "Julian Cuevas is awarded the Cayo Coco Estate with all of its annexes, dependencies, and endowments (illegible) of its foundation, with the obligation to inform the minors who have their paternal legitimate recognized there of all of their assets when they have reached the age of majority." *Id.* at 3.[5] The booklet also contains a notarized lease of Cayo Coco between Julian Cuevas and Celestino Rodriguez Gomez dated March 3, 1916. In 1929, Julian Cuevas intended to sell Cayo Coco to John Teophilus Hodge, but the sale was rescinded. *Id.* at 4.

The booklet on Cayo Coco also states that Isabel Angulo y Guzman predeceased her husband, and the "Auto de 10 de Enero de 1895" (January 10, 1895) issued in Moron, declared the children as heirs to her half of the property by intestate succession as explained in Gonzalez's

---

[2] The Court has noted in other orders that the booklet is hearsay evidence.  Plaintiff's expert Avelino Gonzalez relies on the booklet to corroborate his opinion that Plaintiff's family owned Cayo Coco in the late 19th century and until the Castro regime confiscated it.
[3] Unless otherwise noted, references to exhibits are to exhibits attached to Plaintiff's Statement of Material Facts in Support of Plaintiff's Motion for Partial Summary Judgment filed in both cases.
[4] The translation indicates the probate proceeding was documented in 1878, but the original document states 1876.
[5] At oral argument, the parties agree that the current-day Angulo family, other descendants of Juan Fco. Angulo, also claim ownership to Cayo Coco.

expert report.  The heirs to half the property were Julio (a/k/a Julian Jr.), Elvira, Emilio, Maria

Luisa and Maria Teresa. Julian Cuevas died as a widower on September 26, 1930, and he is the

Plaintiff's great-grandfather. *Id.* at 4. When Julian Cuevas died, his will devised the Cayo Coco

property to his then-surviving children[6], Julian Jr., Elvira, Maria Teresa, Carmen, and Emilio

Cuevas Angulo. (Exh. 49, Notarial Recording Act Number 140 of September 16, 1932) ("Act

No. 140").[7] The Notarial Recording Act documenting this transfer is authenticated by a notary

named Dr. Amancio Gari Flores. These heirs paid taxes on the Cayo Coco property. (Exh. 13,

Tax Receipts from 1957-1959). Emilio Cuevas passed away without a will and his children

inherited his interest. Julian Cuevas, Jr. and Maria Teresa Cuevas died unmarried and childless

and thus, their interests in Cayo Coco passed to their surviving siblings (Carmen and Elvira) and

Emilio's heirs – Manuel, Elda, Zeida, and Julian. Plaintiff testified that Carmen Cuevas

administered the property during this time.  On July 15, 1959, a Declaration of Ownership was

registered with the Municipality of Moron recognizing Carmen and Elvira Cuevas Angulo and

the heirs of Emilio Cuevas Angulo as proprietors of Cayo Coco. The document provides a legal

description. (Exh. 7). On September 27, 1959, Elvira Cuevas Angulo died intestate in Cuba and

her two children – Rosa Elvira and Julian Echevarria (Plaintiff's father) – inherited her interest.

Carmen Cuevas died on December 23, 1962, unmarried and childless, and her interest thus

passed to her nieces and nephews – the children of Elvira and Emilio. Plaintiff's aunt, Rosa

Elvira Echevarria, died childless in Florida in 1986 and his father Julian Echevarria died intestate

in Florida in 1987.  Plaintiff's father, Julian Echevarria, was survived by his wife Cira Marquez

---

[6] Maria Luisa predeceased her father Julian Cuevas Angulo.
[7] The parties dispute the authenticity of this document and its effect. Defendants argue it does not establish that Julian Cuevas owned title to Cayo Coco on the date of his death.

and their children, Aureliano, Carmen, and Mario Echevarria.  Plaintiff's mother Cira Marquez died intestate in Florida in 1993. Her son, Plaintiff's brother, Aureliano, predeceased her.

Defendants dispute Plaintiff's evidence regarding his family's claim to ownership and his inheritance of the claim. Defendants argue that for the family members that died intestate, Plaintiff cannot show that anyone took the necessary steps under Cuban law to inherit any assets, including any ownership of Cayo Coco. Defendants' foreign law expert, Ambar Diaz, asserts that Cuban law imposes requirements necessary to distribute a decedent's estate to his or her heirs. In her view, the record evidence does not properly show the family members took the necessary steps to effectuate the transfer of the property. It is undisputed that there was no declaration of heirs filed in Cuba upon Plaintiff's grandmother Elvira Cuevas Angulo's passing in 1959 at the time of the Castro revolution. The parties dispute whether this interest was, in fact, inherited due to the lack of the declaration of heirs. Defendants also assert that many of the documents that Plaintiff uses to support his claim are hearsay and not properly relied upon by the expert.[8]

*B. Confiscation*

Defendants move for summary judgment arguing that Cayo Coco was public property long before the Castro regime took control of Cuba. Defendants' expert opines that as a coastal island, Cayo Coco was public property and therefore, Plaintiff cannot establish that his ancestors owned the land. She bases this opinion on Article 371 of the Civil Code of 1889, also known as the Law of Ports. Plaintiff's expert, Gonzalez, disputes the application of that law to Cayo Coco, which he claims was not an island surrounded by navigable maritime waters.

---

[8] The Court has already excluded the booklet on the history of Cayo Coco and other newspaper articles as hearsay. The Court denied the motion to exclude the Declaration of Ownership by Carmen Cuevas registered in the Municipality of Moron, but of course, the Court will revisit any objections.

Assuming the Law of Ports does not apply to Cayo Coco, Defendants nevertheless maintain the Plaintiff fails to show Cuba confiscated Cayo Coco. On May 17, 1959, the Cuban Council of Ministers adopted the First Agrarian Reform Act, which adjudicated that land holdings of more than 995 acres were subject to expropriation for distribution among peasants and workers.[9] Defendants' expert Ambar Diaz disputes the First Agrarian Reform Act applied to Cayo Coco, because the Act exempted from expropriation rural areas devoted to cattle ranching. Gonzalez opines that Cuba confiscated Cayo Coco through Cuba's Second Agrarian Reform Act in 1963, which nationalized and adjudicated to the Cuban government "all private land larger than 167 acres (five caballerias)." The parties also dispute whether on February 9, 1993, the Cuban Ministry of Justice, under Resolution Number Twenty-Three, issued a judicial mandate recognizing that the Cayo Coco Property had been acquired by the Cuban state. The mandate was recorded in the Property Registry of Moron in the Certification of Dominion, dated November 28, 1995.

*C. Trafficking*

An examination of Defendants' working structure is at issue in the motions for summary judgment. Plaintiff's theory of the case is that there is a sufficient nexus between Expedia Group and its wholly owned subsidiaries through which it conducts business to consider them one and the same. Expedia Group is a Delaware corporation that was formed in 2005 under the name Expedia Inc. It changed its name effective March 26, 2018. Expedia Group's principal place of business is in Seattle, Washington and it is the holding company of Expedia Inc. (also known as Expedia-WA). As the holding company, Expedia Group does not provide services to the public and does not control Expedia-WA or its subsidiaries' day-to-day operations and activities.

---

[9] Plaintiff relies on an article from the American Bar Association to substantiate what the First Agrarian Reform Act did. At trial, Plaintiff will not be allowed to rely on hearsay to prove this point.

Expedia Group does not provide online booking services. Expedia Group, Expedia-WA, and Expedia-WA's subsidiaries have some shared services, like corporate finance and human resources.  Expedia Group, however, does not own or operate the server systems, internet domain names, or trademarks associated with any travel websites or mobile applications, including www.expedia.com, www.hotels.com, www.orbitz.com, www.travelocity.com, wotif.com, ebookers.com, and www.cheaptickets.com. Instead, Expedia-WA owns www.expedia.com, and its associated server systems, internet domain names, or trademarks. Certain Expedia-WA's subsidiaries own and operate the other listed websites and the associated server systems, internet domain names, or trademarks. Because Expedia Group asserts that it offers no reservations to the public, it claims it did not receive compensation and cannot be liable under Helms-Burton.

Plaintiff disputes that Expedia Group received no compensation for reservations at the trafficked hotels, which are the Iberostar Mojito, Iberostar Colonial, and Pullman Cayo Coco. He cites the contract with Mar Caribe (Exh. 29), which is signed by a Vice President of Lodging for Expedia, Inc. on behalf of various affiliates including Defendant Hotels.com.[10] Plaintiff also cites the contract with Accor S.A. (Exh. 30), which is signed by a Director for Expedia Lodging Partner Services on behalf of Expedia Inc. and Defendant Hotels.com.[11] The agreement with Cubanacan, S.A. (Exh. 31) is also provided to support Plaintiff's position. It, too, is also signed by a Director on behalf of Expedia, Inc. acting on behalf of other entities including Defendant Hotels.com. As further support for his position, Plaintiff cites the deposition of Expedia employee Ricardo Valdes, who testified that Expedia partnered with and received money from

---

[10] Notably, this contract with MarCaribe International Turismo, S.L.U. was entered on June 16, 2017, before Expedia, Inc. (Delaware corporation) changed its name to Expedia Group, Inc. in 2018.
[11] Notably, this contract with Accor S.A. was entered on December 2, 2015, before Expedia Inc. (Delaware corporation) changed its name to Expedia Group, Inc. in 2018.

the Cuban Ministry of Tourism to advertise Cuba as a destination to the U.S. market. (Exh. 24 at 83-84). The record evidence also shows the reservation charts for the trafficked hotels (Exh. 32, 33, and 34). These charts show reservations made through various Expedia entities, such as Expedia US and Expedia Frances, Hotels US, and Orbitz. Bookings under the contract with Mar Caribe were made on Expedia websites with check-in dates up to November 2, 2019 for the Iberostar Mojito. (Exh. 32). Bookings under the contract with Cubanacan were made on Defendants' websites with check-in dates up to December 4, 2019, for the Iberostar Colonial Hotel. (Exh. 35). Bookings under the contract with Accor were made on Expedia websites with check-in-dates up to November 5, 2019, for the Pullman Cayo Coco. (Exh. 34). The record also shows the revenue for each hotel (Exh. 36) and the testimony of Expedia employee Richard De Sam Lazarus states the revenue from each hotel. (Exh. 25 at 112). Defendants dispute that they sold reservations with check-ins beyond the October 7, 2019, OFAC cutoff. They argue that non-party Expedia-WA (formerly Expedia Inc.) sold those reservations through expedia.ca. Defendants also provide record evidence to establish that not all the Defendants were responsible for the bookings at the Subject Hotels. (Exh. 54).

Defendants also disclosed evidence after discovery closed in this case and after years of litigation relating to third-party packages, which bundled hotel stays at the subject hotels, and other travel components such as flights and transportation. Defendants admit that this evidence shows that non-party Expedia-WA offered bookings at the subject hotels as late as 2022. Defendants state that "3PP bookings were available from February 2017 through April 2019, February 2020 through early October 2020, and, due to a mistake by a third-party, for less than ten days in May 2022." Defendants' Corrected Mot. for Summary Judgment at 4.

## II.   Legal Standard

Fed. R. Civ. P. 56 provides, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to judgment as a matter of law.'" *See Alabama v. N. Carolina*, 130 S. Ct. 2295, 2308 (2010) (quoting Fed. R. Civ. P. 56(a)). The existence of some factual disputes between litigants will not defeat an otherwise properly ground motion for summary judgment; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis added). Mere "metaphysical doubt as to the material facts" will not suffice. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251 (1986). The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992).

## III.   Analysis

In 1996, Congress passed the Cuban Liberty and Democratic Solidary Act, commonly known as Title III of the Helms-Burton Act, which provides that "any person that . . .traffics in property which was confiscated by the Cuban government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property[.]" 22 U.S.C. §

6082(a)(1)(A). The purpose of this law was to "strengthen international sanctions against the Castro government" and to "protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime." *Id.* at § 6022(2), (6). Under Title III of the Act, Congress condemned the Cuban government's confiscation of property stating that "[t]he wrongful confiscation or taking of property belonging to United States nationals by the Cuban Government, and the subsequent exploitation of this property at the expense of the rightful owner, undermines the comity of nations, the free flow of commerce, and economic development." 22 U.S.C. §§ 6081(2)-(3). Congress therefore concluded that "[t]o deter trafficking in wrongfully confiscated property, United States nationals who were the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." *Id.* at § 6081(11); 22 U.S.C. § 6082(a)(1)(A).  As a result, Title III provides a private right of action against "any person who 'traffics' in confiscated Cuban property." *Garcia-Bengochea v. Carnival Corp.*, 407 F. Supp. 3d 1281, 1284 (S.D. Fla. 2019) (citing 22 U.S.C. § 6082(a)(1)(A); 22 U.S.C. § 6082(a)(1)(A); 22 U.S.C. § 6023(13)(A)). Shortly after the law's enactment, however, the President invoked Title III's waiver provision to suspend the cause of action. In May 2019, President Trump lifted the suspension, which made Title III effective. *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 919 (11th Cir. 2023). Plaintiff filed this case soon after.

As noted, the primary goal of the Helms-Burton Act cause of action is to "deter trafficking in wrongfully confiscated property;" specifically, the property of "United States nationals who were victims of these confiscations." 22 U.S.C. § 6081(11). To achieve its goal of

deterrence, the Helms-Burton Act places liability on private actors that participate in trafficking property stolen by the Cuban government. Section 6082(a)(1)(A) provides, in relevant part:

> [A]ny person that . . . traffics in property which was confiscated by the Cuban government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages in an amount equal to the sum of __
> (i) the amount which is the greater of __
>
> (I)     the amount, if any, certified to the claimant by the Foreign Claims Settlement Commission under the International Claims Settlement Act of 1949, plus interest;
> (II)     the amount determined under section 6083(a)(2) of this title, plus interest; or
> (III)     the fair market value of that property, calculated as being either the current value of the property, or the value of the property when confiscated plus interest, whichever is greater; and
>
> (ii) court costs and reasonable attorney's fees.

22 U.S.C. § 6082(a)(1)(A). The Act provides a broad definition of trafficking, stating that "an actor can trigger liability simply by knowingly and intentionally 'caus[ing], direct[ing], participat[ing] in, or profit[ing] from' 'another' person's 'use' of property that was confiscated by the Cuban government." *N. Am. Sugar Indus. Inc. v. Xinjiang Goldwind Science & Tech. Co., Ltd.*, 124 F.4th 1322, 1328 (11th Cir. 2025).

Defendants move for summary judgment on Plaintiff's Helms-Burton cause of action and Plaintiff filed a motion for partial summary judgment as to the affirmative defenses. Defendants argue that the record evidence does not establish that Plaintiff "owns the claim" to the Cayo Coco property. Plaintiff asserts that he owns a claim equal to 12.5% interest in Cayo Coco that he inherited from his ancestors, who owned Cayo Coco prior to the Cuban government's confiscation. In addition to arguing that Plaintiff cannot establish that he inherited a claim to ownership of Cayo Coco, Defendants also argue that there was no trafficking of the property as bookings at the three relevant hotels ceased before they received notice of the Plaintiff's claim.

To prove trafficking, Plaintiff must establish that Defendants "knowingly and intentionally . . . engage[d] in a commercial activity using or otherwise benefitting from confiscated property. . .without the authorization of any United States national who holds a claim to the property." 22 U.S.C. § 6023(13)(A). Defendant Expedia Group, Inc. also asserts that Plaintiff failed to plead vicarious liability as to it and that Plaintiff should not be able to assert such a claim in response to summary judgment.  It also argues that as a holding company it never offered or sold reservations for any hotel in Cuba. Finally, Defendants' motion for summary judgment argues that Plaintiff cannot establish damages.  Plaintiff filed a motion for partial summary judgment as to the Defendants' fifteen affirmative defenses.

### A.   Ownership & Confiscation

Cuba's Civil Code of 1889, which was in force when Plaintiff's ancestor Julian Cuevas acquired his ownership interest in Cayo Coco, required that all acts or contracts concerning the creation, transfer, acquisition, modification, and extinction of property interests on immoveable property had to be proved by a public instrument. A "public instrument" meant a document authorized by a Notary or by a competent public official, with the formalities required by law. Thus, under Cuban law, a party claiming an interest in real property would have to produce a public notary's deed evidencing the acquisition of ownership of that land, or a final administration or judicial decision establishing ownership. Defendants claim that Plaintiff fails to produce such a document.

Before examining Plaintiff's factual proffer on ownership, the Court notes that much of Plaintiff's evidence is hearsay. "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)).

"Nevertheless, 'a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form.'" *Id.* (quoting Macuba, 193 F.3d at 1322). The Eleventh Circuit has long recognized that an expert may rely on hearsay evidence as part of the foundation for his opinion so long as the hearsay evidence is "the type of evidence reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject." *United States v. Scrima*, 819 F.2d 996, 1002 (11th Cir. 1987); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993) (noting that experts are given "wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.").

The Court recognizes that Plaintiff's evidentiary support for his claim of ownership relies on hearsay evidence. Indeed, the Court has already ruled that the book *Cayo Coco Una Isla Robada al Mar* is inadmissible hearsay, as well as newspaper articles. That being said, Plaintiff's expert, Avelino Gonzalez may rely on hearsay evidence reasonably relied upon by experts in the particular field. He testified that he considered the booklet to be a reliable source because the authors worked for the Cuban government and had full access to the registries and the archives located in Moron, Cuba. (Exh.1, Gonzalez Depo. at 31). He added that the authors created this booklet at a time when the Cuban government sought to sell off islands to potential European investors. The booklet was written prior to the passing of the Helms-Burton law. He testified that Julian Cuevas was the owner of the property. To support that opinion, Gonzalez states that Julian Cuevas Angulo acquired ownership of Cayo Coco in 1876 in the probate trial of his father-in-law. It is unclear what happened after that date, but again on September 12, 1896, Gonzalez relies on the authors' findings that there was a purchase deed in 1896 in which Julian Cuevas Angulo buys Cayo Coco from Mrs. Aguera Cisneros. In 1910, there was a mortgage and

13

a satisfaction of that mortgage recorded in 1913. (*Id.* at 63-64). Then there is a deed of rescission where Julian Cuevas and Mr. Hodges rescinded a sale of the land.  And when Isabel Angulo passed away, there was an adjudication of inheritance. The notary in the town of Moron had the deed as well in his protocol. (*Id.* at 39). When Julian Cuevas died, his will devised the Cayo Coco property to his children, Julian, Jr.(Julio), Elvira, Maria Teresa, Carmen, and Emilio Cuevas Angulo. (Exh. 49, Notarial Recording Act Number 140 of September 16, 1932).[12] The Notarial Recording Act Number 140 documenting this transfer is authenticated by a notary named Dr. Amancio Gari Flores. Gonzalez opined that this protocolization document was the last deed that existed, which adjudicated the property to the Cuevas family and is conclusive of ownership. (Gonzalez Depo. at 86). Gonzalez also relies on evidence that the 1932 heirs paid taxes on the Cayo Coco property. (Exh. 13, Tax Receipts). Finally, Plaintiff points to a Declaration of Ownership July 15, 1959, registered with the Municipality of Moron recognizing Carmen and Elvira Cuevas Angulo and the heirs of Emilio Cuevas Angulo as proprietors of Cayo Coco. The document provides a legal description. (Exh. 7). Gonzalez relies on these archives in forming his opinion that Plaintiff's ancestors privately owned Cayo Coco.

Defendants dispute Plaintiff's evidentiary support. Their expert Ambar Diaz opined that Plaintiff did not produce a proper public notary's deed evidencing the acquisition of ownership of the land, or a final judicial decision establishing ownership. Defendants argue that the documents that Plaintiff produced – the rescinded deed to Mr. Hodge, the mortgage and satisfaction of the mortgage, the Notarial Recording Act Number 140, and the tax bills -- do not suffice under Cuban law to prove Plaintiff's ancestors owned the property.

---

[12] The experts dispute the effect of Act 140. Gonzalez states that in Cuba notaries were private, but they maintained a protocol, which is a registry. He adds that when the notary retires, all the work would be sent to the national archive.  (Gonzalez Depo. at 115). Ms. Diaz opines that the Act 140 was merely a probate document and cannot evidence property ownership.

The parties' experts also dispute whether the property was confiscated by the Cuban government. Defendants' expert Ambar Diaz testified that under Article 371 of the Civil Code of 1889, the islands formed in the seas adjacent to the coasts of Cuba and to the navigable rivers belonged to the state long before Castro revolution. Put another way, the Castro regime did not confiscate Cayo Coco because in her view, the island belonged to the state since 1889.  Gonzalez disputes Ambar Diaz's claim that Cayo Coco was public property based on Article 371 of the Civil Code of 1889, also known as the Law of Ports. Gonzalez states that the Law of Ports did not apply to Cayo Coco because it was a land body that was not under the maritime terrestrial zone.  He says that because Cayo Coco has shallow waters around it, the island was not a navigable port; therefore, the Law of Ports did not apply to it.  He adds that the state never contested the Cuevas family's ownership of Cayo Coco, as happened with other islands like Cayo Loco,[13] which was in navigable waters in the bay of Cienfuegos.  (Gonzalez Depo. at 74). Prior to February 9, 1993, there was no judicial determination showing the state as owner of Cayo Coco. It is Plaintiff's position that on that date, February 9, 1993, the Cuban government registered Cayo Coco under its name to lure tourism investors like Iberostar and it did so in an executive mandate.

At this juncture, the Court finds that summary judgment is not appropriate given the parties' competing interpretations of Cuban law regarding ownership and the effect of those interpretations on the facts of this case. Federal Rule of Civil Procedure 44.1 requires the Court to make a legal determination of what Cuban law requires.  The Court will hear testimony from each expert, outside the presence of the jury, to determine the Cuban law on property ownership.

---

[13] A Cuban Supreme Court case adjudicated Cayo Loco property of the state.  Gonzalez also testifies that under the civil law system in Cuba, the law of this case is not necessarily applied to other cases. Gonzalez Depo. at 76.

The Court will revisit the issue of ownership at the close of the Plaintiff's case, and if appropriate, instruct the jury accordingly.

The Court has scheduled a hearing to determine foreign law on ownership.  The issues the Court will consider at that hearing regarding ownership and confiscation include but are not limited to: (1) The application of Article 371 of the Civil Code of 1889 (a/k/a the Law of Ports) to Cayo Coco; (2) Whether the documents relied on by Plaintiff's expert sufficiently establish a public document under Cuban law to show property ownership. These documents include the Notarial Recording Act Number 140 of September 16, 1932, Plaintiff's deed of rescission with Mr. Hodge, tax receipts, and a Declaration of Ownership registered with the Municipality of Moron recognizing Carmen and Elvira Cuevas Angulo and the heirs of Emilio Cuevas Angulo as proprietors of Cayo Coco in 1959; and (3) The effect of the First Agrarian Law, the Second Agrarian Law, and the Cuban Ministry of Justice Resolution Number Twenty-Three (from February 9, 1993) recognizing that the Cayo Coco Property had been acquired by the Cuban state.

### B.  Inheritance

Defendants also move for summary judgment arguing that even if Plaintiff establishes his family owned Cayo Coco, he cannot establish that he properly inherited any claim to the property. Their main contention is that intestate succession in Cuba imposes certain requirements necessary to distribute a decedent's estate to his/her heirs, including, in the absence of a registered will or declaration of intestate heirs, the issuance and proper registration of a judicial declaration of heirs.

To substantiate his inheritance, Plaintiff first points to Act No. 140, which is a public instrument authenticated by a notary with the formalities of law.  Plaintiff's expert Gonzalez testifies that Act No. 140 has the effects of transferring through testamentary inheritance the title

to Cayo Coco to the heirs of Julian Cuevas at his death.  Act No. 140 completed, in Gonzalez's view, the partition and acceptance of the inheritance because it was examined by a court and public notary. Defendants' expert Diaz disputes this position claiming that Act No. 140 is ineffective because Julian Cuevas was not the legal owner of the Cayo Coco estate so it was not his to devise.

Next, Plaintiff points to a 1956 Declaration of Heirs of Maria Teresa Cuevas, which in his view is also a public instrument that transfers Maria Teresa's portion that she inherited intestate from her mother Isabel Angulo and by will from her father Julian Cuevas. It is Plaintiff's position that this declaration effectively passed Maria Teresa's interest to her surviving siblings, which includes Plaintiff's grandmother Elvira Cuevas Angulo. On July 15, 1959, a Declaration of Ownership was registered with the Municipality of Moron recognizing Carmen and Elvira Cuevas Angulo and the heirs of Emilio Cuevas Angulo as proprietors of Cayo Coco. The document provides a legal description. (Exh. 7). On September 27, 1959, Elvira Cuevas Angulo died intestate in Cuba and it is Plaintiff's position that Elvira's two children – Rosa Elvira and Julian Echevarria (Plaintiff's father) – inherited her interest. Defendants contend that when Elvira died intestate, her heirs did not employ the proper procedures to do a declaration of heirs and therefore, did not properly inherit. It is undisputed that there was no declaration of heirs or comparable procedure. Gonzalez, however, notes that at the time of Elvira Cuevas Angulo's death in 1959, the Castro regime was taking control and it was impossible for the heirs to comply with the probate procedures that previously were in place.  Gonzalez adds that the Cuban revolutionary government immediately controlled all the registries and institutions related to real property. Again, this disputed issue precludes summary judgment.

On the inheritance law issues, the Court will again hear from the experts, outside the presence of the jury, to determine the status of Cuban law at the time of Plaintiff's grandmother's death. The Court will make the Rule 44.1 determination of the law, consider any motion for directed verdict, and if appropriate, instruct the jury accordingly. On the issue of inheritance, the Court will hear from the expert witnesses on whether Cuban law required a declaration of heirs in 1959 when Plaintiff's grandmother (Elvira Cuevas Angulo) died or is it sufficient that due to the revolution it was impossible to record that declaration given the Castro regime's approach to private property.

### C. Trafficking

Defendants move for summary judgment under the trafficking prong of Helms-Burton for two reasons. First, Defendants argue that Expedia Group, Inc. never offered or sold reservations for any hotel in Cuba. Second, Defendants assert they did not "knowingly and intentionally" engage in activity benefitting from confiscated property.

### 1. Expedia Group, Inc.

At a status conference on March 13, 2025, Plaintiff readily admitted that if he could, he would amend his complaint to name the operating entity, Expedia, Inc. (a/k/a Expedia-WA). Plaintiff named Expedia Group, Inc, the parent holding company, and Expedia-WA's subsidiaries, which include the Operating Defendants – Hotels.com L.P., Hotels.com GP, LLC, and Orbitz, LLC. Having chosen not to name Expedia, Inc.(a/k/a Expedia-WA) in this case, Plaintiff's theory is that Expedia Group blurred the lines between itself and its subsidiaries to conduct business in Cuba and now tries to evade accountability by drawing strict lines. Plaintiff's claim is that Expedia Group benefitted from trafficking the subject hotels, both directly and through its subsidiaries.

Defendants move for summary judgment arguing that Plaintiff did not plead vicarious liability claim or a claim to pierce the corporate veil and Plaintiff cannot raise this theory of liability on a motion for summary judgment.  Next, Defendants argue, that even if the Court allows Plaintiff to raise an agency theory of liability, Plaintiff cannot show that Expedia Group exercised such control over Expedia-WA, Hotels.com, or Orbitz. Finally, Defendants argue that as a parent holding company, Expedia Group did not offer any reservations at the subject hotels.

After examining the operative complaint, the Court finds it provides sufficient notice that it was suing Expedia Group, Inc. as a parent company. It reads: "Expedia is the corporate parent company of numerous brands. In fact, Expedia lists a total of 21 subsidiaries or affiliates, *through* which it maintains more than 200 travel booking sites across more than 70 countries, and *through* which it offers more than 1 million properties for rent." Amended Complaint (emphasis added). It provides a chart from Expedia Group's website, which suggests that Expedia Group oversees over 20 corporate entities, which include the co-defendants, Hotels.com and Orbitz. And it oversees, "Expedia," which is Expedia, Inc. (a/k/a Expedia-WA), a non-party responsible for offering some of the bookings at issue in this case. Plaintiff also alleges that Expedia Group's most recent 10-K annual report states that Expedia Group and its affiliates offer bookings through various models. The Court finds that these allegations are sufficient to give notice that Plaintiff sued for direct liability and under an agency theory. "At the pleading stage, a [plaintiff] must allege 'sufficient facts to render it facially plausible that . . . an agency relationship [is] . . .present." *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1236 (11th Cir. 2014).

The next issue is whether the record establishes that Expedia Group, Inc. could be held liable as a parent company.  "The parent corporation, to be liable for its subsidiary's acts under

the agency theory, must exercise control to the extent the subsidiary manifests no separate corporate interest of its own and functions solely to achieve the purposes of the dominant corporation." *Lobegeiger v. Celebrity Cruises, Inc.*, 869 F. Supp. 2d 1350, 1356 (S.D. Fla. 2012) (citing *MeterLogic, Inc. v. Copier Solutions, Inc.*, 126 F. Supp. 2d 1346, 1356 (S.D. Fla. 2000)). Although the Court recognizes that this is a high level of control, the Court is reluctant to find on summary judgment that there is no genuine issue of material fact on this issue. *See Amaro v. Certain Underwriters at Lloyd's London*, No. 18-23503, 2019 WL 4722697, *2 (S.D. Fla. 2019) (finding that agency determinations are usually fact intensive). For example, Defendants admit that Expedia Group and Expedia-WA are affiliates of each other. Moreover, there is record evidence that Expedia Group's employees are "Governors" of Expedia-WA and are based in Washington. They are Robert Dzielak (EVP, General Counsel and Secretary), Mark D. Okerstrom (President and CEO), and Alan Pickerell (CFO & EVP Operations). (Defendants' Statement of Facts at Exh. H). The Court also notes that in the course of this litigation, Defendants filed a motion seeking the Court allow Defendants' counsel to disclose the contents of the settlement with the Booking Defendants to their client, whom they identified as the General Counsel for Expedia-WA. Moreover, the entity that applied to the Office of Foreign Asset Control for permission for Cuba-related business was Expedia Group, which was previously also known as Expedia, Inc. Given the structure of this conglomerate, the Court finds there is an issue of fact as to the level of control and the relationship amongst the entities. The Court will revisit the issue of Expedia Group's control over the affiliates on a full record at the close of Plaintiff's case, should Defendants make a motion for directed verdict.

Having found there is an issue of fact as to whether Expedia Group can be held liable under an agency theory, the Court need not address whether the record evidence sufficiently

establishes direct liability for trafficking. The Court will note, however, that Plaintiff's response to summary judgment does not dispute that Expedia Group did not offer reservations. The record, however, establishes that two of the three lodging contracts were signed by Expedia, Inc.; at the time of those contracts' executions, Expedia Group was known as Expedia Inc. Therefore, it is unclear which entity entered into the contractual relationship for lodging in Cuba.  There also is no dispute that Expedia Group is the entity that applied for the OFAC license, which was needed to engage in the business activity. Helms-Burton broadly defines trafficking by stating that "a person 'traffics' in confiscated property if that person knowingly and intentionally . . . engages in a commercial activity using or otherwise benefiting from confiscated property[.]" 22 U.S.C. § 6023(13)(A)(ii), or "causes, directs, participates in, or profits from, trafficking. . . by another person, or otherwise engages in trafficking. . . through another person without the authorization of any United States national who holds a claim to the property." 22 U.S.C. § 6023(13)(A)(iii).  Given the broad definition of trafficking, the Court denies the motion for summary judgment as to direct liability for Expedia Group because there is some evidence from which a reasonable jury could find trafficking even absent it directly selling reservations online.

## 2.  *Scienter Requirement*

Helms-Burton's trafficking prong hinges liability on the person "knowingly and intentionally" trafficking the property. "'Knowingly' means with knowledge or having reason to know." 22 U.S.C. § 6023(9). "Knowledge" is generally understood to mean "actual knowledge," while "reason to know" is commonly understood as "constructive knowledge." *See Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1313 (11th Cir. 2019). Certainly, by the time, the Operating Defendants offered bookings on their websites for hotels in Cuba in 2017, the Helms-Burton Act had been on the books for over twenty years.  "Despite the absence of any lawsuits being filed pursuant to Title III since its enactment, [Defendants are] on notice of Title

III's existence form the time it became law in 1996, and [they] had an obligation to familiarize themselves with the mandates of Title III, especially once it began operating in Cuba." *Havana Docks Corp. v. Norwegian Cruise Line Holdings, Ltd.*, 484 F. Supp. 3d 1215, 1237 (S.D. Fla. 2020) (quoting *N. Laramie Land Co. v. Hoffman*, 268 U.S. 276, 283 (1925) ("All persons are charged with knowledge of the provisions of statutes and must take note of the procedure adopted by them and when that procedure is not unreasonable or arbitrary there are no constitutional limitations relieving them from conforming to it.")).

The question then is whether the Defendants had knowledge or reason to know that they were "trafficking" confiscated property.  To support this contention, Plaintiff asserts that Defendants admit they failed to investigate whether the hotels were on confiscated land. Expedia employee Valdes testified that Defendants did not ask the Cuban government for documentation regarding ownership of the trafficked hotels and never took Helms-Burton into consideration when offering booking services in Cuba. (Valdes Depo. at 133, 139).  Defendants' team also had google alerts for cibercuba.com. (Delgado Depo. at 52). On June 25, 2019, the website cibercuba.com posted an article on four lawsuits under the Helms-Burton Act, including that the Angulo Cuevas family sued those operating the trafficked hotels.  (Exh. 18).[14] Even though the cibercuba article is hearsay and insufficient to show Defendants' knowledge, the Court nevertheless finds that there is an issue of fact as to whether the failure to investigate given the longstanding law constitutes willful blindness. *Luxxotica Grp.*, 932 F.3d at 1313 (finding willful blindness is a form of constructive knowledge). The Cuban government's confiscation of all

---

[14] This article is hearsay evidence, and whether it can be rendered admissible at trial is unclear. Therefore, the Court does not give it weight.  The Court notes that the parties may address the admissibility of this document during the trial.

private real property was well-documented at the time Defendants began selling reservations at the hotel properties.

Moreover, there is an issue of fact as to when Defendants had notice and when they ceased offering bookings. On June 24, 2019, Plaintiff filed this case. On June 29 and 30, Defendants continued to assist booking reservations at the Iberostar Colonial and Iberostar Mojito. On August 7, 2019, Plaintiff sent a letter to Defendants advising of their intent to bring a class action.[15] Although Defendants had ceased making new reservations, they did not cancel any upcoming reservations, with check-in dates until November 2019. Defendants also admit that non-party Expedia-WA offered third-party package bookings at the subject hotels after July 1, 2019. Indeed, Defendants admit that Expedia-WA offered these third-party package bookings from June 2017 to July 2022. If Plaintiff succeeds in proving agency before the jury, then he may seek liability for these bookings that took place well into this litigation. Given these issues of fact, the Court denies summary judgment. The issues of fact are: (1) when did Plaintiff provide notice of the suit and to whom, (2) what efforts did Defendants make to determine if the property was confiscated, (3) when did the Defendants cease offering reservations, and (4) did the Defendants cancel any reservations with check-in dates after the suits were filed.

### D. Damages

Lastly, Defendants move for summary judgment arguing Plaintiff cannot establish his claim to a 12.5% share of Cayo Coco and that even if he could, there is insufficient evidence of damages. Plaintiff provides evidentiary support for his 12.5% claim. Defendants take issue with the calculation Plaintiff provides (12.5%) because "under Florida intestate succession law in

---

[15] The original defendants received this notice. The original defendant was a subsidiary of Expedia Group, Inc. called Trivago, N.V.

effect at the time, only one-half of Julian Echevarria's interest would have passed to his wife (and Plaintiff's mother), Cira Marquez, on his death, and the other half to their descendants *per stirpes*." *See* §§ 732.102, 732.104, Fla. Stat. Plaintiff, in fact, asserts that his mother inherited half of his father's claim at his death, or 25% of Cayo Coco and the other 25% was dispersed to Plaintiff and his siblings in 5 equal parts or 5% each.[16]  When one of Plaintiff's siblings, Aureliano, predeceased his mother, Aureliano's 5% interest passed to his mother. Cira Marquez then owned a 30% interest.  When Cira Marquez died in 1993, her 30% interest passed in four equal parts to her four surviving children at 7.5% each, which included the Plaintiff. §§ 732.103(1), Fla. Stat. In sum, Plaintiff asserts he inherited a 5% interest from his father and a 7.5% interest from his mother for a total of 12.5%.  Any dispute as to this calculation and as to whether Plaintiff's father inherited the claim is an issue best reserved for trial.

As to the damages issue, the Act provides for statutory damages "equal to the fair market value of that property, calculated as being either [i] the current value of the property, or [ii] the value of the property when confiscated plus interest, whichever is greater." 22 U.S.C. § 6082(a)(1)(A). Plaintiff proffered the expert witness, Frank Nardozza, to testify as to the current value of the property as a measure of damages.  Pending before the Court is a separate motion for reconsideration to limit Nardozza's testimony. The Court will consider argument on this issue during the trial to determine how best to instruct the jury on the proper measure of damages. Defendants request the Court limit Nardozza to testify on the land value and Plaintiff requests the Court allow Nardozza to testify about the fair market value of the properties, which include the improvements and the value of the hotel operations.

### E.  *Plaintiff's Motion for Partial Summary Judgment on the Affirmative Defenses*

---

[16] According to Plaintiff, his father owned 50% of Cayo Coco at the time of his death since he inherited his sister's half (Plaintiff's aunt).

Plaintiff filed a motion for summary judgment as to the 15 affirmative defenses.  Given that the Court is allowing the case to proceed to trial, the Court will not limit the Defendants from presenting their affirmative defenses, which includes their defenses that the bookings they offered were incident to lawful travel to Cuba and that their conduct was authorized by a license issued by the Office of Foreign Asset Control. Accordingly, the Court denies the Plaintiff's Motion for Partial Summary Judgment on the Affirmative Defenses.

DONE AND ORDERED in Chambers at Miami, Florida, this 28th of March 2025.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record